315-0034, Reuben Walker and Karen Jean Wall are appellated by Karras, Abinata, and David June v. GMAC Mortgages, appellant by Peter King. Mr. King. Good afternoon. May it please the Court, Counsel. My name is Peter King, and I'm counsel for defendant GMAC Mortgage, the appellant in this matter. We are here today to address the trial court's granting of summary judgment in favor of the plaintiff, Walkers, and the subsequent approval of judicial sale pursuant to the Walker mortgage. The history of the litigation is well-versed throughout the briefs, and in the interest of saving time, I would like to address the issues from the onset. The two issues I appeal before this Court are, first, whether the circuit court erred when it refused to allow defendant GMAC Mortgage leave to file a counterclaim based on an equitable lien. The second issue is whether the Court erred when it found, as a matter of law, that the defendant GMAC cannot claim status as a bona fide purchaser. The standard for review in this case is de novo, as the issues are both purely legal in nature. The first issue that I would like to address with this Court is the circuit court's denial to allow defendant GMAC to file its counterclaim for an equitable lien. And that's based on segregation? That's correct, Your Honor. Pursuant to the Illinois recording statute, mortgages take effect and are in force from and after the time of recording. There is no dispute here that the ESP mortgage was recorded prior to the Walker mortgage. The ESP mortgage was recorded on June 6, 2008. The Walker mortgage was recorded slightly three months later on September 12, 2008. Now, the fact that the Walkers executed their mortgage prior to the recording of the ESP mortgage, and even prior to the execution of the ESP mortgage, is not a factor in the subrogation analysis. Therefore, at the time the Walkers took their interest in the subject property, they were junior lieners on the property, subject to the interest of the ESP mortgage. In effect, they were second mortgage holders. Now, in Illinois, a party may seek an equitable lien against real property to secure the payment of a debt, which is exactly what GMAC was looking for when it filed its motion to file its counterclaim. In this matter, GMAC sought to file a counterclaim based on subrogation. Specifically, GMAC sought to be equitably subrogated to the position of the ESP mortgage. Now, in Illinois, courts have defined equitable subrogation simply as a creature of chancery that is used to prevent unjust enrichment. The doctrine of conventional subrogation has more requirements than that, but the doctrine of equitable subrogation has a very short and simple definition. In its application, equitable subrogation is applied by a court to ensure that a junior lien holder does not benefit unjustly to the detriment of a new lender for the payoff of a first mortgage. Applied to the case here, equitable subrogation would be used to ensure that the Walkers, as junior lien holders, do not benefit unjustly to the detriment of GMAC, the new lender. Now, GMAC's not subrogated to the full extent of the mortgage, of its entire mortgage. Your argument is only to the extent of that ESP mortgage of $82,000 or something. You are correct. It is actually the amount paid, and I believe it is right around $83,000, but it is the amount paid to extinguish the ESP mortgage. There were no assignments in this original mortgage, were there? I'm sorry? There were no assignments. Of the original ESP mortgage? Not that I'm aware of. It was only on record, I believe, a short time. And it was released. It was released after this GDC mortgage paid it off. Right. Correct. It was released. It was released, yes. And this, again, is exactly what GMAC was seeking to do in the trial court. GMAC has set forth the chain of mortgages on the subject property in its brief. But in sum, working backwards, the most recent mortgage on the property is a GMAC mortgage. The GMAC mortgage is still valid and in force. The GMAC mortgage, the funds from that mortgage at closing were used to pay off the GDC mortgage, which, your honors may recall, was recorded after the Walker mortgage. The funds from the GDC mortgage were used to extinguish the ESP mortgage. And by tracing the payments from the GMAC mortgage to the GDC mortgage, and the GDC mortgage back to the ESP mortgage, GMAC is entitled to be subrogated to the position of the ESP payoff. Now. And this, you know, who's paying who for what is explicit in the recorded documents. It is explicit in the proposed counterclaim that was provided to the court. The documents, the releases of the mortgages were public record. The mortgages themselves were public record. The actual payment documents were acquired through subpoenas of the mortgage files. And the documents, I would assert, are available and would prove that the funds from each mortgage, starting with the GMAC mortgage working back, were paid directly to those lenders to release those lender liens. Which is exactly what one does when one gets another mortgage. Correct, your honor. Now, the fact that the GMAC mortgage is not the immediate successor to the ESP mortgage in the chain of refinance does not change the subrogation analysis. GMAC cited the case of Shekinah v. Washington Mutual, which is a federal case out of the Northern District of Illinois. But I would submit to this court that the Shekinah court applied Illinois law in its analysis. In the Shekinah case, the court allowed the mortgagee, the last in line, to trace payoffs back over two intervening mortgages that the borrower claimed were forged and allow Washington Mutual to be subrogated to the last acknowledged mortgage by the borrower. So the fact that the GMAC mortgage did not immediately follow the ESP mortgage does not prevent GMAC from seeking subrogation. The analysis from the Washington Mutual court was simply that had the Washington Mutual loan not paid off the prior mortgage, which paid off the prior and so on, the original acknowledged mortgage by the borrower would still be of record and the borrower would be subject to that mortgage. Here, the GMAC mortgage paid off the prior GVC mortgage. The GVC mortgage paid off the ESP mortgage. I don't understand your reasoning here. All of those mortgages were released when the new mortgage was made, right? After the ESP. It paid off and released. Correct. Why isn't that the end of the story? Why isn't each one of those cut off? Because, Judge, can... Can we be equitable or what? Oh, I didn't mean to interrupt, Your Honor. I do apologize. No, no, no, no. I just got excited. I got ahead of myself. The Ames case that was cited in our briefs adds some clarity to that situation. In the Ames case noted, under standard subrogation principles applicable to refinancing mortgages, the lien of an old mortgage continues in effect without interruption and a new mortgage does not become subordinate to an intervening lien attaching between the time of recording of the old mortgage and the effective date of the new one. So that lien essentially continues. And under equitable principles, it all comes down in reassert to this, Judge. Had GMAC not paid off the GVC mortgage and had the GVC mortgage not paid off the ESP mortgage, the walkers would still be subject to that ESP mortgage. They took title... They took their interest in the property as second lien holders to prevent unjust enrichment. If this court does not allow GMAC to pursue its subrogation at the trial court level, the walkers go from a second lien priority to a first through no action of their own and to the detriment of the subsequent lenders that paid off that prior debt. I believe some of these may have had it, Judge, but I would submit to Your Honor that that is inapplicable. And actually, there's a case... I believe it was recited... Possibly in my reply brief. You're saying that if the title policy, or mortgage policy in this case, says that there's the walker lien, walker mortgage, and no other mortgages, and then you go ahead and file as a secondary lender, and then you go ahead and file, that you say it doesn't matter? That's correct. That's correct, because, again, the definition is simple. It's to prevent unjust enrichment. And the courts throughout Illinois have consistently held that allowing a junior lien holder to go to the position of a first merely for the fact that a new lender paid off that first lien is an unjust windfall. As the Shekinah Court held, the new lender is left holding the bag with no recourse against the property. But you knew, if you looked at that policy, you knew that there was the walker mortgage, and I can't remember which one was before yours, that that was the only other mortgage, right? And that that was secondary to the walker mortgage, which had been recorded years before. Yes. Yes, and you're correct, Your Honor. Notwithstanding the fact that... I mean, I... I apologize. Again, I did not mean to cut you off. The fact that the mortgage was possibly of record in the title commitment, notwithstanding the fact that the title commitment also revealed a release that was at issue of the walker mortgage, the case law in Illinois is clear. It doesn't matter. Knowledge of the intervening lien does not prohibit equitable subrogation. You can have actual knowledge of that mortgage. You're saying in every case where there's successive mortgages being paid off prior one, that an equitable lien applies? If there is an intervening lien, Your Honor, that is not... I'm assuming that. You're saying that in every case like that, that that other mortgage, that intervening lien, is essentially irrelevant? It is not irrelevant, Judge. It still has the same lien position that it had when it took its interest to the property, subject to the mortgage that was ahead of it. So the walkers did not take their interest as a first mortgage and all of a sudden have new lenders coming in. They took their interest as a second. They were on notice under the recording statutes. They were on notice that there was an ESB mortgage in front of them. This is not a case where the ESB mortgage ran its course and was paid off over time by the borrower. That's not the case here. Does it have to be paid off by the mortgage? It has to be paid off by a new lender, not by the mortgagor. If the mortgagor pays off the mortgage... No, I'm saying is that the only criteria that would allow for an equitable lien not to apply? Well, Judge, I can't... I mean... I can't claim a blanket statement for every case that applies. What I can say in this case, in the case law that was cited in our brief, that when a new lender pays off a first lien and there's an intervening lien order, they are entitled to be equitably subrogated to the position of the first, to the amount it paid off, not to the face value of the policy, not to the amount of the mortgage that it took. And that is because, again, when the walkers took their interest as junior lien holders, they knew they had actual notice, constructive notice, of a prior mortgage and that they took their interest subject to that mortgage. Well, by way of clarification, just to... Okay, you've got $82,000 in mortgage and everything. Let's say when GMC comes in, let's suppose they loan these folks refinancing. Let's say they give them $500,000. Okay. And then the walkers come in and try to foreclose their mortgage. Yes. Well, GMAC is only first in line for $82,000. You are correct. And whether they get their other $420,000, then that's their bad because they should have known about the walker. Right? Well, it's their bad because that's all they're doing. It just slows them down more than that. So it's not like they get first priority on everything. They get it to the extent they're subrogated for paying off the $82,000. Correct. What we would seek is an equitable lien of $82,000, a first and paramount equitable lien of the exact payoff of the ESB mortgage, foreclose that, the walkers would have the next interest and in all likelihood wipe out the rest of the... And the walkers are in the same position as if GMAC, as if there had been no refinancing. Correct. Thank you very much. I apologize. I would next like to briefly discuss the bona fide purchaser affirmative defense that was rejected by the court, if I may. A bona fide purchaser takes its interest free and clear of all claims, except those of which it has notice. In the case of Barr, we contend that GMAC did not have notice of the walker interest. Now, it is not disputed that the GBC mortgage took its interest after the recording of the walker release. The walker release is the one that was disputed and that the court found was invalid on its face. Prior to execution of the GBC mortgage, it was provided with another document that purportedly was signed by the walkers. And so we're clear, in this argument,  and that what I call an affirmation is attached to the appendix before the court at page 120. And whatever inquiry notice that GBC was on because of this invalid release, we contend can be shown at the trial level that they followed up on that inquiry notice and satisfied their inquiry notice by following up and getting a second affirmation of the release purportedly signed by the walkers. Now, the walkers claim that GMAC cannot rely on the, quote, bad reliance on the release by GBC. But the reliance was not bad because, as we can show at the trial court level, the GBC mortgage investigated further and got other documents substantiating the fact that the walkers released their interest. And by relying on that mortgage representation, it had clear title. GMAC took title as a BFP as well. Now, even if this court finds that GMAC, well, even GBC took free and clear, but GMAC, you still had knowledge of this invalid release on its face, you had notice of the walker interest. In Illinois, in another state in the union, as provided in our brief, if GBC is found to be a bona fide purchaser, free and clear of the interest of the walkers, and GMAC is charged with notice of the walker interest, GMAC still takes title clear of the walker interest because it's taking from a BFP. And those... Well, let me ask you this. Yes, sir. This was on summary judgment, right? The walkers were granted summary judgment. The walkers were granted summary judgment. On your bona fide purchaser issue. No. We moved to... We filed affirmative defenses. They filed, I believe it was 2615, motion to dismiss, which was granted. Okay. So it was not a summary judgment. It was... That's correct. It was on a 2615 motion to dismiss, or 26... Or 26191, and I apologize for not... Probably. All right. But the court in its ruling said that while this release is invalid on its face, therefore you can't be a BFP. We assert that if we are allowed to pursue that claim in trial, or in the trial court, we can show that GBC mortgage was a bona fide purchaser, and as such, because GMAC took its interest from GBC, that it follows as a BFP as well. May I conclude briefly? Very briefly. For the reasons discussed this afternoon and the contents of the record, we respectfully request that this court reverse the granting of summary judgment and approval of foreclosure sale in favor of the walkers, and remand the matter back to the trial court to allow GMAC to present its counterclaim in affirmative defense. Thank you very much. Thank you, Mr. King. I should say, before we get started, Mr. Kelly, that you may know that there are adjustment dates. Chair is empty. She was unable to be with us at this court call. However, she will take part. She obviously has read the briefs. We'll be listening to a recording of this argument, and will participate fully in the conferencing of the case. So with that said, Mr. Bernardo. Good afternoon. May it please the court. Counsel. For the record, Your Honors, for us of an honor on behalf of the appellees, Ruben and Karen Walker, who are the plaintiffs in the underlying foreclosure case. At this stage, Your Honors, the police will be exercising Illinois Supreme Court Rule 352D, where it will be dividing its arguments. The purpose that I'm here is just to argue procedural issues. I'll try to be as quick as possible. And I will turn over the podium, if you may, Your Honors, to Mr. David Andrew June. He will be arguing the substantive issues in this case. The first issue that I would like to proceed with is JMAC's motion to substitute party defendant. This was a motion that was filed in the appeal by JMAC on May 19th of 2015. The appellees filed a response to the affirmative defense on May 27th of 2015. And the reasoning for our objection was that the motion was untimely. The reason why it was untimely is that the assignment was made on April 22nd of 2014, where JMAC assigned its mortgage to Auckland. 393 days later, the motion was filed. So we would be asking that pursuant to Illinois Supreme Court 366A2, based on the appellate court's discretion, to deny it as it is extremely untimely. And did that delay in time cause you any prejudice? Judge, the prejudice with that is the walkers were litigating against a party that had absolutely no interest in the mortgage anymore. When we filed our response with our objection, and just briefly, all beneficial interests were assigned to Auckland. Auckland sat on its hands for 393 days and did nothing, while it should have done it as soon as possible. So that's the prejudice that we state to your honor. The second procedural issue that I would like to raise is in JMAC's brief, in its conclusion, it asks this court for five requests. To reverse the order confirming sale, reversing the order for summary judgment, order denying JMAC's motion for leave to file a counterclaim, reverse the order striking JMAC's affirmative defense, which was brought 615, your honor, and motion to reconsider. And just briefly, JMAC does not raise any of these issues in their review. All it does is have a blanket statement saying that all issues presented before your honors is de novo. Well, each of these orders have different types of standards of review, abuse of discretion or de novo, depending on the type of issue brought forth. The way we argue with Judge is these issues need to be raised in the brief properly, with the proper standard of review, and the reason why JMAC wants this court to review and reverse the denial or the granting of certain motions. What you heard is JMAC jumps the gun and just argues why it's entitled to an equitably impeded subrogation. We think it's improper pursuant to Illinois Supreme Court 341H3, which is incorporated to your administrative order number 48. We have to state the standard for review and your reasoning why. With that reason said, Judge, your honors, the five requests that are listed in the brief are considered opposition ways if it doesn't comply with Illinois Supreme Court rules and your administrative orders. And with that said, Judge, if it's okay, I would turn over the podium to Mr. Dunn. Great. Okay. Thank you, Mr. Dunn. Thank you, Judge. Mr. Dunn. Thank you. May it please the Court. Counsel. David Andrew Dunn on behalf of the plaintiffs and appellees, Ruben and Karen Walker, addressing some of the substance. One of the things that really needs to be understood, because it gets a little fuzzy, is the timeline of everything, which was set out very well in Judge Danis' memorandum and decision in court order, which was entered November 25th of 2014, trial court record C665. And that sets out the timeline, because one of the things that keeps getting missed is the Whoppers executed their mortgage prior to any of this started. They sold the property to the Flintstones. They took back a mortgage for the sale price of the property. They just didn't record it. So when the Walkers – Just not recording it is a huge problem. Oh, absolutely. I absolutely agree. But counsel keeps saying that the Walkers took their mortgage as a second mortgage. They didn't take their mortgage as a second mortgage. They recorded their mortgage as a second mortgage. When they took it, there was no other lien on the property. And if you look at the cases that counsel cites, that is the major distinguishing difference between all the cases that counsel for GMAC cites in our situation. Because in Shekina, for instance, in Shekina, Mrs. Shekina was saying, hey, I never signed those subsequent mortgages, so I get my house free and clear, because somewhere along the line they paid off the mortgage that I acknowledge I signed. She was looking for a major benefit. In another case that counsel cites, Union Planters, the mortgage that was being jumped, the court found that Union Planters knew of a first mortgage. They took a second mortgage so that they knew what position they were in when they got it. So when a third mortgage paid off the first, they allowed the third to jump into the first position because the second knew that the first mortgage existed when they signed the mortgage. Here the Walkers did not know it. They didn't take it as a second mortgage. They recorded it as a second mortgage. Well, what about ESB? What did they know when they loaned money? Well, a good reading of the record would indicate that the Flintshams were pretty much committing a fraud down the line. The Flintshams didn't disclose, and there's no reason to believe that they disclosed to ESB that they had the Walker mortgage. So ESB lent them $80,000. So ESB thought they were taking a first mortgage. Absolutely. And if we were here arguing against ESB, we lose. Well, and so what's the difference if somebody else paid? So why do you bid $82,000 if somebody else paid ESB? One of the questions is, and that's what I was sort of expecting, is what harm is it to the Walkers if you allow GMAC to move into ESB's position? Now, that happened in 2008. The whole ESB payoff, Walkers were never notified. Walkers, or someone, we pretty much assume it was Flintshams, presented some of GDC with this release that is clearly a no-release, and yet they relied on it and allowed them to get the mortgage. They then took another mortgage for $166,000, so they paid off ESB. And then they pocketed $87,000. Supposedly, they were making payments to Summit. Not GMAC, the Flintshams pocketed. The Flintshams, I'm sorry. The Flintshams pocketed $80,000. Were then making payments to the Walkers for their $320,000 mortgage, which the Walkers were receiving. But then also paying payments to GMAC or Summit or whoever of $160,000. And that went on for three years. Well, had the Walkers been notified right from the beginning that the Flintshams were going and applying for the second mortgage and at that time realized that ESB had a mortgage in front of them, they could have made the decision, okay, we're going to pay off ESB, so we come into the first position. But they were never given that ability. They were never notified that the Flintshams were trying to get the subsequent mortgage. But that's not GMAC's fault. Well, what's GMAC's fault, and it traces back to GBC and it traces back to Summit, is they knew that the Walkers had a mortgage. It was clear. And I sometimes get mixed up on the timeline. But when GBC, when the Flintshams go to GBC and say, we'd like a mortgage for $166,000, GBC says to the Flintshams, well, we need you to release this Walker mortgage. It wasn't released. So the Walkers were never notified. And then when the Flintshams go to Summit Mortgage, which GMAC takes over for, Summit has a title report that's reflected in the record that says, there's an existing mortgage on this property. Once again, the Walkers were never notified. And had the Walkers been notified anywhere along that line, they could have made the decision to pay off the SB. Well, right, but the Walkers weren't prejudiced by anything like this. The rest of these mortgages, anything over and above $82,000, I mean, they still got priority over that, just like they did before somebody paid off the SB's mortgage. But had the Walkers known back, again, in 2008 when this first came up, they could have foreclosed on the mortgage right away. But it didn't come up. They were never notified. So all they would have needed – They wouldn't have foreclosed on the mortgage if you said the people were making the payments at that time. Well, and if the people continued, if the Flintshams continued to pay the ESB mortgage of $80,000 and the Walkers mortgage of $320,000, perhaps they would have had sufficient funds to do that. But now you have this intervening mortgage that didn't notify the Walkers of $166,000, double the payments, that the Flintshams made for we're not sure for how long. But I guess my point is, during that time when the Flintshams were paying the Walkers, as long as they were making those payments, the Walkers couldn't foreclose on that mortgage. True. True. But if – There wasn't a Jeopardy provision in the mortgage. Is it a foreign mortgage? I'm sorry? Is it a foreign mortgage? Yeah, it was a self-made mortgage. But, again, it had provisions. I believe Mr. Walker's sister or sister-in-law, something, had helped prepare it. She was an attorney in Texas or something like that. I think that was record. So it wasn't the greatest mortgage in the world. But it was sufficient. It could be foreclosed. There were a lot of foreclosure situations. But then again, and that's the point, is by allowing the subrogation, to get $160,000 to cash out mortgage, to increase their payment, to not allow the Walkers to make their own decision whether or not they want to pay off ESB, because they realized, okay, we're now in second position, we'll pay off ESB, we'll just increase the payments, we'll do whatever it takes. But you allow this intervening company, intervening entity that knows that the Walkers have a mortgage, ignore the Walker mortgage, pay off the first mortgage and say, now we want to assume the first position. If the court were to allow that, there really would be no reason for subrogation agreements. Anytime somebody comes and they have a first mortgage that they want to be paid off, and they have a second mortgage, and they're going to a third mortgage to pay off the first, the third says, we need a subrogation agreement. We need the second mortgage holder to agree that we're going to take the first position. Which, once again, lets the second mortgage holder know what's going on. And if the second mortgage holder says no, then... But under the law, that's if you want to take the first position as to your entire mortgage, as opposed to just the amount of the first mortgage. That's a big difference. It could be to any amount. Because the law, and that's the thing that GMAC is also trying to do. They're trying to apply the law, which we agree to, the statute, to say ESB takes first mortgage. But then they're trying to ignore the statute when they say, if you pay off ESB, then you take first mortgage, you take ESB's position. And that's not what the statute says. The statute says... That ought to be done by a signer, right? Correct. If they signed that all down the line, they would have a perfect mortgage. Exactly. If that was a sign. It wasn't a sign. They were all released. It wasn't a sign. And then if it's paid off, it's released, then the rockers move into first position, because that's what the statute, that's exactly what the statute says. And counsel's trying to have it both ways. He's trying to say the statute applies to ESB, who really took the second mortgage, but is in first position because they recorded first. What do you do with all the case law that talks about refinancing a mortgage being segregated to the position of a mortgage they refinanced? The two cases that are really counsel relies on mostly is Shekinah. And, again, in Shekinah, it's a different situation, because the walkers didn't receive any of the proceeds from any of these notes. The walkers didn't promise to pay any of these notes. The walkers just filed their mortgage as a second mortgage. Counsel, you have one minute. Thank you. In Shekinah, Mrs. Shekinah is the one that was trying to get out of paying the note that she acknowledged by saying, since someone paid off this mortgage, I get the benefit. And in Union, Union Planters, once again, the court acknowledged, the court recognized the fact that Union Planters was aware when they took their mortgage that they were taking it as a second mortgage. There was a mortgage ahead of them. So, once again, that's a distinguishing factor. But, again, there are absolutely harm that happens to the walkers because they were never notified that the Fletchers were going for these subsequent mortgages. They could have taken action back, again, in 2008, where they could have gone forward. I mean, there's no speculation, is there? Yeah. I mean, there's no difference to that. Oh, absolutely. Absolutely. They wouldn't have had all the attorney's fees in all the process. I mean, there's substantial attorney's fees, and were they notified initially, they could have made the decision. They could have paid the $80,000 rather than some other entity come in and say, well, we paid it, so we're going to take that decision. Does it affect their status? And how many payments? Does it affect their status? I'm sorry, the walker's status? Well, if you allow the equitable subrogation, absolutely. But even if you accept the $80,000 that was owed, payments of that for the three years that it would have taken to foreclose or that it took to begin the foreclosure proceeding, those all could have been made. Well, my guess is that if they went over and offered GMAC the $82,000 now, that this case would be over. And they've had the time value of that money. That's just a guess, but there's something close to that. So to speculate they would have done it then, I speculate they could probably still do it. But had they done it again three years ago, they could have told the Flintians, Flintians, we just paid off this $80,000 mortgage. You need to pay us that back too. But they weren't allowed to do that. And once again, the Flintians who, it's pretty clear we're committing a fraud on this deal, kept paying to subsequent mortgage holders funds that now can't be collected on the walkers' part when they begin the foreclosure proceedings. And perhaps that's what got the Flintians into the position where they couldn't pay the walkers in the first place because they were paying GMAC. Thank you. Thank you, Mr. Chairman. Thank you. And Mr. King, any rebuttals? Thank you. And again, may it please the court and counsel, I hope not to jump around too much on these issues that were raised by counsel.  I would like to note on the onset this idea that the title commitments of the subsequent mortgages reflected the presence of the walker mortgage in the chain of title. Notwithstanding, again, the argument related to the release, the unauthorized release of the walker mortgage, in its opening brief, appellant cites the restatement third property where it says, quote, Subrogation can be granted even if the payor had actual knowledge of the intervening interest. The payor's notice, actual or constructive, is not necessarily relevant. So whether or not that mortgage showed up in the chain of title is irrelevant for the purposes of equitable subrogation. Counsel, for the walkers, has not provided any case law that says equitable subrogation can't be applied in this situation. Counsel, again, has not shown this court any prejudice that the walkers would suffer, other than the inability to pay off the subrogation amount three years prior. And again, that, I would assert to the court, does not fall on the shoulders of GMAC or GBC mortgage. That, as Your Honor noted to Counsel, if they are set on paying off that $82,000, they still can do that. Now, I can't make that representation that this case would settle, obviously, on behalf of my client at this time, but there is certainly nothing preventing Counsel from going up to 82, or from paying off that prior $82,000 interest. Counsel said that the walkers were a victim of fraud. Well, they were not a victim of fraud from ESB. They were not a victim of fraud from GBC mortgage, nor were they a victim of fraud on behalf of GMAC. Whether or not they are victims of fraud by the flinchums, by the borrowers, that's an action that can be pursued against the flinchums by the walkers, but it can't be applied to GMAC or GBC, or ESB mortgage for that matter. Counsel, again, has provided nothing to show that allowing equitable subrogation would be unjust. He has not indicated any reason why the walkers should incur a windfall of $82,000, which is exactly what this would be should GMAC not be allowed to pursue its subrogation claim. $82,000 is they're seeking a pure gift, which, again, was cited in our brief, and all of our courts have found that should a party, a junior lien owner, receive the benefit of the payoff of a mortgage that's in front of it through no detriment or no action of its own, they are seeking what is essentially a pure gift, and in this case, an amount of $82,000. And we would assert to this court that that is what is unjust. It's unjust to GMAC. It's unjust to GBC mortgage as well. Thank you very much. And then finally, regarding the motion to substitute, it was my understanding that the motion was already taken under advisement by the court. I was not aware that there was going to be argument on the motion to substitute today, but I would say that the Walkers did not suffer any prejudice, that the litigation was proceeding consistently both in this court and other courts in a related matter to this mortgage, and it did not cause any unjust delay to claim it for no prejudice. And the issues, again, were probably raised in order for GMAC to pursue its counterclaim and to pursue its affirmative defense. Obviously, the motion for summary judgment has to be vacant, as does the approval of judicial sale. Okay. Thank you very much. Thank you. And thank you all for your argument today. Thank you. We will take this matter under advisement. We beg you to review this position within a short time.